**Robert GOODMAN, Donal Wall and Thomas Prokawski, Respondents,**

v.

**Raymond F. McNALLY, Earl J. Gates, D. Jeff Lance, William A. Schmalz, Gus O. Nations, as Board of Police Commissioners, St. Louis County, Missouri, Appellants.**

No. 37275.

Missouri Court of Appeals,
St. Louis District,
Division Four.

Sept. 27, 1977.

Motion for Rehearing and/or Transfer Denied Nov. 14, 1977.

Application to Transfer Denied Dec. 19, 1977.

---

Thomas W. Wehrle, St. Louis County Counselor, Andrew J. Minardi, Associate County Counselor, Clayton, for appellants.

London & Greenberg, Lawrence J. Fleming, St. Louis, Ronald S. Rothman, Clayton, for respondents.

ALDEN A. STOCKARD, Special Judge.

Robert Goodman, Donal Wall and Thomas Prokawski were police officers of St. Louis County, and on September 13, 1973, each was disciplined by the Superintendent of Police for violating certain rules contained in the Department's Code of Discipline and Ethics. Lieutenant Goodman was reduced to a patrolman and Patrolmen Wall and Prokawski were dismissed from the force. Each officer appealed to the Board of Police Commissioners, and after a lengthy adversary hearing the Board sustained the action of the Superintendent as to each officer. The three officers then filed a petition for judicial review, and after a hearing the court entered judgment in favor of each officer and ordered each to be reinstated to his former position with back pay from the date of their discipline. The Board has appealed. We affirm in part and reverse in part with directions.

The transcript of the hearing before the Board is quite lengthy. There are ten volumes of testimony, copies of interviews and exhibits totaling more than seventy-five in number, twenty-six cassette tape recordings, and more than twenty reports and other exhibits. A substantial portion of this pertains to charges which the Board found not to be substantiated by the evidence.[1]

1. The findings of the Board, insofar as material to the issues on this appeal were as follows:

### AS TO ROBERT GOODMAN
#### Findings of Fact

1. That Goodman took no steps to see to the return to the true owner of the copy machine seized from Freddie Darrell Swan, on or about May 18, 1973, or to return to Swan the copy machines that were rightfully his.
2. That on or about July 25, 1973, Goodman permitted his subordinates to search the residence of Mrs. Eunice Moody at 9825 South Broadway, St. Louis without a search warrant or other justification.

#### Conclusions of Law

1. In the matters set out in Finding No. 1 above, Goodman violated the Department's Rules and Regulations, Code of Discipline and Ethics, specifically:
   (a) Paragraph 6.11 <u>Discreditable Conduct</u>: By acting in a manner prejudicial to discipline or tending to bring discredit on the reputation of the Department.
   (b) Paragraph 6.14 <u>Neglect of Duty</u>: By neglecting or without sufficient cause omitting promptly and diligently to attend to, or carry out, something which was his duty as a member of the Department.
2. In the matters set out in Finding No. 2 above, Goodman violated the Department's Rules and Regulations, Code of Discipline and Ethics, specifically:
   (a) Paragraph 6.19 <u>Unlawful or Oppressive use of Authority</u>:

By being guilty of oppressive and tyrannical conduct toward a member of the public.
3. As a result of these violations, Goodman is not qualified to perform the duties of a supervisor, and should be reduced to the rank of patrolman, commensurate to his years of service.

#### Order

It is therefore ordered that the discipline imposed by the Superintendent is hereby affirmed, and that Goodman's reduction to the rank of patrolman, commensurate to his years of service, is hereby sustained.

### AS TO THOMAS WAYNE PROKAWSKI
#### Findings of Fact

1. That on or about 8 June 1973, when Jerry Zook saw an automobile parked at the Forder School, he abandoned his intention to burglarize the school, but that Prokawski ascertained that the automobile was abandoned and that no person was then present in the school, which information he communicated through Freddie Darrell Swan to Zook, and thereby induced Zook to proceed with the burglary. However, no mention is made of these facts in the report of the burglary which Prokawski approved, nor did he officially divulge these facts until they were brought out during the investigation of his conduct made by the Department's Bureau of Internal Affairs.
2. That Prokawski showed a tenacious desire to insure that the crime of burglary and stealing at the Forder School would occur,

In their petition for judicial review filed pursuant to Rule 100 respondents alleged that the Board's findings as to each were "not supported by competent and substantial evidence upon the whole record" and that the action of the Board "is arbitrary and capricious and constitutes an abuse of discretion." The court held that the "findings of the Board of Police Commissioners with respect to each [respondent] are unsupported by competent and substantial evidence upon the whole record and are contrary to the overwhelming weight of the evidence."

■ The standard for review as to the sufficiency of the evidence in this case is prescribed by Rule 100.07 where it is provided that the judicial inquiry "may extend *to a determination of whether the action of the agency * * * [i]s unsupported by competent and substantial evidence upon the whole record; * * *.*" The reviewing court is not to weigh the evidence for itself, but rather is required to view the evidence in the light most favorable to the decision of the tribunal, giving to the administrative decision the benefit of all reasonable inferences to be derived from the evidence produced. *State Board of Registration for the Healing Arts v. Finch*, 514 S.W.2d 608, 616 (Mo.App.1974); *Friedman v. Miller*, 525 S.W.2d 770 (Mo.App.1975).

The three officers were members of a Mobile Reserve Unit, created in February 1973, consisting of six patrolmen and Lieutenant Goodman. It is the activities of the officers as members of this unit that gave rise to the charges against them. Respondents point out that there were charges filed against each officer which were found by the Board not to be substantiated by the evidence, and it is argued that the knowledge of these unsupported charges are important in order to have a clear view of the total circumstances resulting in the disciplinary action taken. However, the Board's order as to each officer was based on findings that certain charges as to each were supported by evidence, and it is the findings as to those charges that this court is con-

even after it was abandoned by the principal perpetrator. There is no mention of the facts relating to the auto parked at the school in the police report, nor is there a mention of his subservient actions concerning the auto or his investigation of the school prior to the crime.

### Conclusions of Law

1. In the matters set out in Finding No. 1 above made, Prokawski violated the Department's Rules and Regulations, Code of Discipline and Ethics, specifically:
   (a) Paragraph 6.12 <u>Insubordinate or Oppressive Conduct</u>:
   By withholding information which should have been officially reported.
2. In the matters set out in Finding No. 2 above made, Prokawski violated the Department's Rules and Regulations, Code of Discipline and Ethics, specifically:
   (a) Paragraph 6.14 <u>Neglect of Duty</u>:
   By failing to report something which he knew concerning a criminal charge and failing to disclose evidence which he, or a person within his knowledge, could give for or against a prisoner or defendant to a criminal charge.
3. As a result of these violations, Prokawski's employment as a commissioned police officer of this Department should be terminated as of 13 September 1973.

### Order

It is therefore ordered that the discipline imposed by the Superintendent is hereby affirmed, and that the termination of Prokawski's employment as a commissioned police officer with this Department as of 13 September 1973, is hereby sustained.

### AS TO DONAL L. WALL, SR.

#### Findings of Fact

1. That Wall physically abused Mr. Swan when he was at Swan's residence during July, 1973.

#### Conclusions of Law

1. In the matters set out in Finding No. 1 above made, Wall violated the Department's Rules and Regulations, Code of Discipline and Ethics, specifically:
   (a) Paragraph 6.12 <u>Unlawful or Oppressive Exercise of Authority</u>:
   By using violence to a prisoner or other person, namely, Mr. Swan, with whom he was brought into contact in the execution of his duty.
2. As a result of this violation, Wall's employment as a commissioned police officer of this Department should be terminated as of 13 September 1973.

#### Order

It is therefore ordered that the discipline imposed by the Superintendent is hereby affirmed, and that the termination of Wall's employment as a commissioned police officer of this Department as of 13 September 1973, is hereby sustained.

cerned. We shall review the evidence as to each officer.

### Officer Robert Goodman
### The Copy Machine Incident

■ Goodman was made the head of the Mobile Reserve Unit on February 27, 1973, and among those in the unit were officers Prokawski and Wall. He was directly responsible for the operation of the unit and its activities. On May 18, 1973 he, with Patrolmen Prokawski and Burke, conducted a search of the residence of Freddie Darrell Swan and discovered three copy machines. At that time it was determined that one of the copy machines had been stolen in Jefferson County, and Goodman directed that it and the other two be held as evidence. The machines were placed in the evidence locker of the Second District Police Station where they remained until after the imposition of disciplinary action in this case. An application was made for a warrant charging Swan with the receipt of stolen property which was taken under advisement by the prosecuting attorney. No action on this application was taken until December 7, 1973, which was approximately three months after the disciplinary action against Goodman.

The Board found that Goodman took no steps to return to the "true owner" the copy machine seized from Swan. This refers to the machine which Goodman determined, prior to seizure, to have been stolen. The Board also found that Goodman failed to "return to Swan the copy machines that were rightfully his." This refers to the two other machines.

As to all three machines, we find no written rule, regulation or order in the record which imposed a duty on Goodman to see to it that the machines were returned to the owners. In appellant's brief it is stated that "It was Goodman's responsibility ultimately to see that the copy machines were returned to the rightful owners or to the person from whom they had been taken if it could not be established they were stolen." In this case the disciplinary action was taken against Goodman by the Superintendent in a little less than four months after the copy machines were seized. We find nothing in the record to indicate that the duty to "ultimately" return the machines required that they be returned in less than that time. Reference is made by appellants to the testimony of Colonel G. H. Kleinknecht, Superintendent of Police of St. Louis County who had held that office for one year at the time of the hearing before the Board. He testified only that it is the "responsibility of the investigating officer to handle all aspects of the investigation and complaint," and that Goodman should have arranged to return the machines.[2] He made no reference to any directive, regulation, rule or order to that effect. But more important, assuming there was a department policy or understanding as to this matter, there is no explanation of why Goodman should have arranged to return the one machine, known to have been stolen and which was being held as evidence, during the time that an application for a warrant was still under consideration by the prosecuting attorney. Also, there is noth-

---

**2.** Colonel Kleinknecht also testified that after he had taken disciplinary action against Goodman for not returning the machines, Goodman "had * * * time to make arrangements for returning those machines." He also testified that a superior officer of Goodman would be responsible if he "had knowledge" of his failure. At least from the time the Superintendent took the disciplinary action against Goodman he had actual knowledge that the machines had not been returned, and we agree with the comment of the trial court that "One may ask also why the Superintendent didn't see to whatever disposition of the machines he deemed proper after he disciplined Goodman on the matter."

We note that the machine known to have been stolen was not returned to its owner until January 11, 1974, approximately four months after the Superintendent disciplined Goodman. The period of time after the Superintendent had actual knowledge and the return of the machine to the owner was a few days longer than the time from the seizure to the discipline of Goodman. The other two machines were not returned to Swan, but were subsequently determined to have been stolen, and it was more than a year after the disciplinary action was taken before they were returned to their owners.

ing to indicate that it was not reasonable for Goodman to assume the other two machines were potential evidence. There is no showing that under the circumstances four months was an unreasonable time for him to have made the "ultimate" disposition referred to in appellants' brief. The only possible basis for a determination of what was a reasonable time is that Goodman's superiors did not return those two machines to the owners for more than a year.

It thus appears from the undisputed evidence that Goodman was disciplined by the Superintendent, and that action has been sustained by the Board, for the failure to return a stolen copy machine to an owner, then unknown to him and for which no request for its return had been made, and which was being held as evidence in a case which was still under consideration by the prosecuting attorney, and when his conduct violated no express rule, regulation or order. Also, he was disciplined for failing within four months to return the other two machines to Swan, who notwithstanding the finding by the Board, was not the owner and when Goodman had reason to believe they had been stolen and which were also being held as potential evidence.

We necessarily conclude that the findings of the Board that the failure of Goodman to return the copy machines constituted conduct "prejudicial to discipline or tending to bring discredit on the reputation of the Department," and that he omitted without sufficient cause "promptly and diligently to attend to, or carry out, something which was his duty as a member of the Department" are not supported by competent and substantial evidence upon the whole record, and the trial court's finding in this respect must be affirmed.

### The Moody Search

On July 25, 1973, Goodman and several members of the Mobile Reserve Unit went to the residence of Mrs. Eunice Moody at 9856 South Broadway. Officer Kossman had a warrant for the arrest of David Voyles who was charged with a misdemeanor, and the officers had reason to believe that Voyles might be at the Moody house. The officers also had information that there may have been narcotic sales there but they had no search warrant. Goodman and Officers Kossman and Wall went to the front door, the latter officer carrying a sawed-off shotgun. Mrs. Moody gave permission for the officers to search for Voyles, which they did without finding him there. The officers then in the presence of and with the approval of Goodman, searched the premises for narcotics. Searches were conducted of bureau drawers, closets, clothing in drawers, under a mattress, and in cabinets.

■ Goodman asserts at the hearing before the Board that he had oral permission from Mrs. Moody to make the search for narcotics. He testified that he asked her "if we could search for narcotics," and that she replied, "there is no narcotics in the house, go ahead and search," and that a "small search" was then made. Mrs. Moody testified that none of the officers asked permission to search the house, but that "one of them went into [her son's] room and started looking around in the drawers." At the hearing before the Board she could not identify the person, and when she was asked if she saw anyone in the courtroom that she had seen "that evening or that day" she indicated Col. Kleinknecht and said he "might have been" one of the officers. She further testified that she did not give the officers permission to look around and that they did not tell her what they were searching for. On cross-examination she was asked if she remembered stating on deposition, "I don't remember whether I gave any permission or not," and she replied that she did not so remember. The statement in the deposition was not offered in evidence and we cannot determine if the question pertained to permission to search for Voyles or narcotics. When Mrs. Moody's son was asked if the officers asked permission to search the house, and if he heard his mother give her permission for the officers to search, he replied to each question that he did not remember. Mrs. Moody's daughter Patty, testified that she did not hear her mother give permission for

the search, and in answer to the vague question of "While you were present, did you hear your mother discuss with them [the officers] anything about what they were doing?" She replied, "I don't remember."

Officer Kossman testified that he had received information that "the Moody residence was dealing in narcotics," and that he had a warrant for the arrest of David Voyles for tampering with a motor vehicle. He further testified that as he and other officers approached the Moody residence he observed "one of the Voyles subjects at the window." He accompanied Goodman to the door, observed Goodman identify himself and display the warrant for Voyles arrest, and heard Mrs. Moody reply that "She would be more than happy to allow us to come in and search for the subject." He also testified that later he heard her say that Goodman could have permission to search the residence, but "I don't know what that was in reference to."

The trial court held that the findings of the Board regarding the search of the Moody residence "appear to be contrary to the overwhelming weight of the evidence, as well as unsupported by any substantial evidence."

We consider the testimony of Mrs. Moody to constitute substantial evidence that although she told the officers they could search for Voyles, she did not give permission to conduct a general search of her house. It is true that Goodman testified she did give such permission, but that only created a conflict in the testimony to be resolved by the Board before whom the witnesses appeared in person. Our review is limited "to a determination of whether the [Board] could have reasonably reached its result upon consideration of all the evidence before it or whether the [Board's] decision was clearly contrary to the overwhelming weight of the evidence." *Friedman v. Miller*, supra at page 772. We are admonished that we are "not to weigh the evidence" but are to "view the evidence in the light most favorable to the decision of the tribunal." *State Board of Registration*

*for the Healing Arts v. Finch*, supra at page 616. Under the evidence and the circumstances the Board was authorized to conclude that Goodman participated in and authorized those under his supervision to conduct a search of the residence of Mrs. Moody for narcotics when there was no search warrant or other justification. There is no contention that such conduct did not result in a violation of the Department's Code of Discipline and Ethics.

The judgment of the trial court as to this charge must be reversed.

### Thomas Prokawski

Subsequent to the seizure of the copy machine, Prokawski attempted to develop Swan as an informant. According to the information in the police report, Swan called the police and stated that Jerry Zook intended to burglarize the Forder School that night and that he had told Swan that if he did not permit Zook, and apparently others, to use his automobile they would "get him." The police officers, which included Prokawski, told Swan to cooperate. Swan called back and stated that the burglary was to take place about 1:00 o'clock in the morning of June 8. Prokawski advised Swan that he would not be charged with burglary because he did not have the necessary intent. The burglary occurred, the police were waiting, and Zook was arrested after a rather violent resistance. According to the testimony of Swan before the Board Prokawski called him on June 8, 1973 and said that "he needed a burglary that evening." Swan stated that he had previously been approached by Jerry Zook who said that there was some projectors at the Forder School and he asked Swan if he wanted to buy a projector, and Swan said he did not. After the call from Prokawski, Swan located Zook and talked to him about the projectors. After another contact with Prokawski, at which time Prokawski indicated he wanted the burglary to take place about midnight, Swan and Zook drove in Swan's automobile to the Forder School. They saw that an old Cadillac automobile was parked at the school, and Zook stated

that "we can't do anything with him in there." Swan then took Zook back to where he had picked him up and contacted Prokawski and told him about the Cadillac automobile. Prokawski and Officer Burke then went to the school, opened one of the doors and determined that no one was there. He also checked the automobile and determined that it belonged to one of the janitors who was at home. Prokawski then contacted Swan and told him that no one was in the building, that the owner of the automobile was at home, and that it was all right to go ahead with the burglary. Swan then located Zook and they both went to the Forder School and committed the burglary. The police were waiting and Zook was arrested. Prokawski testified that he was not aware that Zook may have abandoned his plan to burglarize the school, and that the only reason he checked out the school and the Cadillac automobile was to be sure that no innocent parties were inside the building where their safety might be jeopardized.

In the report, which was written by Officer Ley but which was signed and approved by Prokawski as immediate supervisor, there was no mention of the incident involving the Cadillac automobile, or that Prokawski had gone to the school to determine that no person was there, or that he had informed Swan that he had checked out the building and the automobile. It is the failure of Prokawski to include this information in the report that the Board found to constitute Insubordinate or Oppressive Conduct and a Neglect of Duty.

The trial court found that there was "no evidence of any rule, regulation or guideline of the Police Department which would apply to either the handling or the reporting of the situation regarding the automobile," and that the findings of the Board with regard to Prokawski are not supported by competent and substantial evidence upon the whole record.

■ We necessarily recognize that it is not reasonable to expect the written rules to prescribe in detail or with preciseness what is to be placed in a police report. By

necessity, the requirement to make a complete report must be general. The Board found that the circumstances of the Cadillac and Prokawski's investigation and reports were material and that they should have been included. Reports of incidents, such as the burglary in this case, form the basis for future action by prosecuting officials, and while legal scholars may disagree, the activities of Prokawski, as related by Swan, present a strong case of probable entrapment which would bear heavily on what cause of action a prosecutor might deem advisable. Also, for the internal management of the Police Department, the supervisors should be fully advised of the actions of the officers so that they might be aware of whether practices being utilized fall within the accepted and authorized procedure.

■ The content of police reports is a matter of internal management of the Department and absent most compelling reasons the courts should not interfere.

■ The Board was authorized to find that the failure to include in the report the above information constituted improper conduct and neglect of duty. For that infraction the Board authorized and directed that Prokawski's employment should be terminated. We do not know if this was a first or a repeated dereliction or neglect. While the punishment seems to us to have been harsh, this too is a matter of discretion with which there should be no interference by the courts absent an abuse of discretion on the part of the Board. It is with some reluctance that we conclude that the punishment imposed was within a reasonable exercise of discretion, and the judgment of the trial court as to Prokawski is reversed.

### Donal Wall

■ In July 1973, Officers Wall and Hines went to the Swan residence. Both had participated in the original arrest of Swan and in the arrest of Zook at the Forder School. According to Swan both officers were not in uniform but were dressed, as Swan testified, to look like "hip-

pies," but he knew them to be St. Louis County police officers because he had previously seen them in uniform. The two officers "just opened up the door" and walked into the house without knocking. Wall identified himself as being from Madison County[3] and said that he wanted "some answers." Swan was seated at the kitchen table and Wall "took his hand" and shoved him to the floor and knocked over the table and chairs. Wall then went downstairs and "went through the drawers" while conducting a search of some nature. When he came back upstairs he told Swan that he, Swan, had seen "the job that was put on Zook" and that he would give Swan one week "to come up with a car thief." Wall told Swan that he would be back, and he indicated that if Swan did not produce a car thief, he was "going to look worse than Zook." When Wall started to leave he told Swan that he was not joking, and he struck Swan in the stomach which "knocked the breath" out of him. While Wall was at the house Ron Taylor and Jerry Zook came to the house but at different times. Their testimony corroborated that of Swan in some respects and was not inconsistent with it. When Wall testified, he admitted that he and Officer Hines went to Swan's house to talk to him "about the Martin brothers," but he denied identifying himself as being from Madison County and he denied striking Swan, although he admitted touching him "in the performance of a play-acting search." He also denied that he demanded that Swan produce a car thief. He admitted that a search was made of the house for "immediate weapons easily obtainable" and to see if anyone else was hiding there.

It is clear that from the evidence the Board was authorized to find that Wall "physically abused Mr. Swan when he was at Swan's residence" in July 1973. Whether such a finding should have been made was an issue of fact to be determined by the Board, and when there is substantial evidence to support the finding, as here, we are not to weigh the evidence but are to view it in the light most favorable to the decision of the Board. In view of this limitation on our judicial function, the judgment of the trial court as to this charge must be reversed.

The cause is remanded and the trial court is directed to set aside its reversal of the Board's decision pertaining to Donal Wall and Thomas Prokawski, and also to set aside its reversal of that part of the Board's decision pertaining to the charge that Robert Goodman permitted a search of the residence of Mrs. Eunice Moody without a warrant or other justification. The trial court's judgment reversing the decision of the Board pertaining to the charge that Robert Goodman failed to return certain copy machines to the owners is affirmed. It is further directed that the trial court refer the cause to the Board for the Board to reconsider its disposition for one charge as to Robert Goodman rather than two.

It is so ordered.

SMITH, P. J., and NORWIN D. HOUSER, Special Judge, concur.

---

3. This apparently had reference to a television commercial depicting a Madison County Sheriff.